**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Kelly Harcourt, <u>et al.</u>,    )
                    )
          Plaintiffs,  ) Case No. 1:02-CV-283
                    )
    vs.              )
                    )
Cincinnati Bell      )
Telephone Company,    )
                    )
          Defendant.   )

<u>O R D E R</u>

This matter is before the Court on motions for summary judgment filed by Defendant Cincinnati Bell Telephone Company (Doc. No. 66) and Plaintiffs Kelly Harcourt, Paula White, and Phillip Donnelly (Doc. No. 69).  For the reasons that follow, Defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**; Plaintiffs' motion for summary judgment is well-taken and is **GRANTED.**

## I. <u>Background</u>

Plaintiffs in this case are current or former employees of Defendant Cincinnati Bell Telephone Company ("CBT") who claim that CBT's administration of its medical leave policy violates the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611, <u>et seq.</u>  Specifically, Plaintiffs challenge three of CBT's medical leave provisions as interfering with or restraining their FMLA

1

rights in violation of 29 U.S.C. § 2615(a)(1).[1]  The first policy at issue requires an employee on intermittent FMLA-approved leave to recertify the qualifying medical condition every ninety days despite the fact that the employee's physician certified the need for intermittent leave for a period in excess of ninety days.[2]  The second policy forbids employees from completing any portion of the medical certification form, under penalty of suspension or termination, even if the information completed by the employee is not false.[3]  The third policy concerns the amount of time CBT

---

[1]     This section provides:

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

[2]     According to its response to one of Plaintiffs' interrogatories, CBT states that its policy is "not to grant leaves for periods of longer than three months in the first instance without requiring re-certification and, if the completed certification form is vague as to the amount of time needed, to specify an amount of time permitted based on medical knowledge, the employee's previous use of FMLA time, and/or the company's experience with employees who have the same or similar condition or family member with the same or similar condition."  For ease of reference, the Court will refer to this policy as "the recertification policy."

Doc. No. 69, Ex. A.

[3]     This policy states:

Under no circumstances should the employee or anyone other than the certifying health care provider or a member of his/her staff complete all or any part of the certification of health care provider form.  Completion of that form by anyone other than the health care provider or his/her staff constitutes falsification of a company document which is subject to disciplinary action including dismissal.

allows an employee to submit an FMLA leave certification for unforeseen medical leave.  Under regulations promulgated by the Department of Labor, an employee has a minimum of fifteen days after a request by the employer to provide a certification of the medical condition by a health provider.  <u>See</u> 29 C.F.R. § 825.35(b).  The employer, however, must give the employee more than fifteen days to provide such certification if it is not practicable to provide it within fifteen days despite the employee's best efforts.  <u>Id.</u>  CBT relies on a statement in its employee handbook that medical certifications are due with fifteen days of the employee's first day of absence as a blanket request to all employees for medical certification.  Employees who do not provide a medical certification within fifteen days of their first absence are charged with an absence occurrence.[4]

To see how these policies affected each of the Plaintiffs, the Court recounts their individual case histories.

A. <u>Kelly Harcourt</u>

Plaintiff Harcourt needed intermittent FMLA leave to care for her adopted daughter, who suffers from emotional and behavioral disabilities.

---

For ease of reference, the Court will refer to this policy as "the authenticity policy."

[4]    For ease of reference, the Court will refer to this policy as "the 15 day policy."

Harcourt first submitted a request for intermittent leave in the spring of 2001 and her daughter's treating psychologist, Dr. Pacey, certified the need for leave in March 2001. CBT approved Harcourt's request for intermittent leave for the period April 1, 2001 to August 31, 2001. CBT, however, required Harcourt to re-certify her leave for an absence on May 20, 2001 when she needed to care for her daughter. Harcourt submitted the recertification in June 2001, but CBT denied the request and gave her an attendance occurrence for missing work.

Harcourt submitted another request for intermittent leave in December 2001. On this occasion, Harcourt used the first certification as a template and filled in the requested information herself. Harcourt then gave the certification form to Dr. Pacey, who reviewed the certification and endorsed it. Harcourt then turned in her leave request. In January 2002, CBT's FMLA leave administrator, Linda Nuss, confronted Harcourt about whether she had written on the form. When Harcourt admitted that she had written on the form, she was suspended for three days without pay for violating the authenticity policy. There is no contention that the information which Harcourt provided in the form was false or inaccurate. Harcourt claims

4

that as a result of the suspension she was ineligible for transfers to two more favorable positions.[5]

In addition to suspending Harcourt for violating the authenticity policy, CBT required her to submit a new certification form. Dr. Pacey completed a second certification form which was substantially the same as the one Harcourt submitted in December. Dr. Pacey certified Harcourt's need for intermittent leave for the period of December 12, 2001 through June 30, 2002 with no limitations on the hours per month that she would require. CBT, however, shortened Harcourt's intermittent leave to a three month period ending on April 1, 2002. Additionally, CBT restricted Harcourt's leave to a maximum of eight hours per month on the advice of CBT's in-house physician because Harcourt's daughter was not incapacitated.

Harcourt resigned her job with CBT in August 2002 because of the difficulties she was having with CBT's FMLA policies and procedures and because she believed that CBT was making medical decisions about her daughter.

B. Paula White

---

[5] Harcourt actually does not know why she did not receive a transfer to the first position. With regard to the second position, however, Harcourt's supervisor would not approve her application because of her suspension. Both positions were more favorable, even though the hourly rate was the same, because Harcourt would have moved from a part-time position to a full-time position. Harcourt Dep. at 101-10.

Plaintiff White needed FMLA leave because she suffers from recurrent desmoid tumors.[6]  In January 1999, White first

---

[6]    Medicine.net explains that a desmoid tumor is:

A benign soft tissue tumor that occurs most often in young adults and involves the limbs or trunk but can also arise in the abdomen or thorax.

Desmoid tumors are benign. They never metastasize (spread to other parts of the body). However, they are very difficult to remove because they intertwine extensively with the surrounding tissues. These tumors look like dense scar tissue. Just like scar tissue, they adhere tenaciously to surrounding structures and organs.

Surgery has been the traditional main mode of therapy for desmoid tumors but up to 70% of desmoid tumors recur after surgery.

Radiation therapy has also been used to treat desmoid tumors. However, this exposes the patient to significant radiation with damage to surrounding tissues and puts them at risk for a cancer caused by the radiation (a secondary malignancy). Radiation also is hampered by a moderate recurrence rate.

The combination of surgery and radiation has also been used to treat these stubborn tumors. While somewhat successful, the combination of wide resection surgery and high dose radiation represents very aggressive treatment for a "benign" condition.

Limited (low dose) chemotherapy emerged in 1989 as a less aggressive treatment for desmoid tumors. The anti-tumor drugs are given in low doses, so there are minimal short-term and usually no long-term side effects.

Limited (low dose) chemotherapy causes one-third of desmoid tumors to vanish, one-third to shrink and the remaining third appear not to change, but they rarely progress and usually stop hurting.

Desmoid tumors are also called aggressive fibromatosis because they are locally aggressive and fibrous like scar tissue.

See http://www.medterms.com/script/main/art.asp?articlekey=9378 (visited August 8, 2005).

applied for intermittent leave for absences caused by chemotherapy and other side effects related to the treatment of the tumors.  White's treating physician initially certified her intermittent leave for a period of "as least one year."  At first CBT approved White's intermittent leave for a three month period, but extended it to six months when she complained.

White filed a second certification for FMLA leave for the period February 12, 2002 to December 31, 2002 for absences related to stent replacement surgery and follow-up office visits and other procedures, including putting in replacement stents. CBT, however, only approved White's leave request for the day of her surgery and informed her that she should schedule follow-up appointments outside of her normal working hours.  White claims that CBT informed her that she would have to file a new request for FMLA leave each time she needed a replacement stent because other employees were abusing FMLA leave.  White filed requests for continuous FMLA leave in April 2002 for stent replacement and in May 2002 for a stent-related kidney infection.  White's continuous leave requests also reiterated her doctor's statement that she needed intermittent leave throughout 2002.  CBT approved only White's request for continuous leave, and then not until October 2002 after she had been assessed occurrences for her absences.  CBT indicates, however, that it rescinded the occurrences after it approved White's leave request.

7

White also claims that CBT denied her request for continuous and intermittent leave in July 2002 for a stent-related urinary tract infection because she submitted her paperwork fifteen days after her first absence as required by 15 day policy.  White also received an attendance occurrence for this absence.  CBT indicates, however, that it placed White on short-term disability for this absence and that she lost no income for this absence, nor did she receive an attendance occurrence for this absence.

White next applied for FMLA leave for November 4-5, 2002 for an exploratory ERCP surgery.[7]  CBT twice denied White's leave request as not "meeting the criteria for approval under the FML."  CBT did approve this leave request after White submitted a leave request for surgery to remove polyps.  White filed another leave request for December 2-5, 2002 which CBT denied on the grounds that she violated the 15 day policy even though she had already been approved for intermittent leave through February 2003.  White says that between February 2002 and December 2002, CBT required her to file nine recertifications for intermittent leave for the same serious health condition even though her very

---

[7]     An ERCP (endoscopic retrograde cholangiopancreatograph) is a procedure in which an endoscope is passed through the patient's mouth, esophagus, and stomach, and into the duodenum, so that the doctor can examine the ducts to the liver, pancreas, and gallbladder.  See http://www.askasge.org/pages/brochures/retro.cfm (visited August 8, 2005).

first application for FMLA leave indicated that she would require
intermittent leave throughout the year.  White claims that she
sought treatment from a mental health professional as a result of
her difficulties with CBT's FMLA policies.  On two other
occasions, White claims that she took vacation leave when she
needed treatment instead of applying for FMLA leave.

### C. Phillip Donnelly

Plaintiff Donnelly needed intermittent FMLA leave to
care for his mother, who suffered from a variety of health
conditions.  Donnelly experienced essentially the same
frustrations as Harcourt and White in seeking CBT's approval of
his leave requests.  CBT consistently required Donnelly to
recertify his leave requests in three or four month increments
even though his mother's physician certified that he would need
intermittent leave throughout the entire work year.  In response
to his complaints about his leave requests, CBT responded that
its decisions about how much intermittent leave to approve were
based on Donnelly's prior usage and that it could, if it wanted,
require him to recertify his need for leave every thirty days.
Donnelly also ran afoul of the 15 day rule when he needed FMLA
leave due to a pinched nerve in his back.

### D. Procedural History

This lawsuit commenced on April 25, 2002, when
Plaintiff Harcourt filed a complaint on behalf of herself and a

potential class of similarly-situated CBT employees alleging that
CBT's medical leave policies did not comply with the FMLA.  On
September 26, 2002, Harcourt filed a supplemental complaint (Doc.
No. 8) which added a claim that she was wrongfully terminated in
violation of 29 U.S.C. §§ 2615(a)(1) & (a)(2).  On December 16,
2002, Harcourt filed a third complaint (Doc. No. 14) which added
Paula White and Phillip Donnelly as named Plaintiffs.  This
complaint also added a claim for intentional and/or reckless
infliction of emotional distress on behalf of Plaintiff Harcourt.
The Court then granted Plaintiffs leave to file a fourth
complaint (Doc. No. 49) which added a claim of intentional or
reckless infliction of emotional distress on behalf of Plaintiff
White.  <u>See</u> Doc. No. 57.  The Court, however, denied Plaintiffs'
motion to file yet another amended complaint and denied
Plaintiffs' motion for class certification.  <u>See</u> <u>id.</u>

        The case then proceed through discovery on the claims
of the named Plaintiffs.  The parties filed cross-motions for
summary judgment on March 15, 2005 (Doc. Nos. 66 & 69).  CBT
moves for summary judgment on each of Plaintiffs' claims.  CBT
argues that Plaintiffs' FMLA claims fail as a matter of law
because its policies do not violate the FMLA.  CBT further argues
that even if its policies do violate the FMLA, summary judgment
in its favor is still appropriate because Plaintiffs did not
suffer any actual injury as a result of the violations.  CBT

10

contends that summary judgment on Harcourt's wrongful discharge claim is appropriate because she did not oppose any wrongful employment practices, she was not subjected to any adverse employment action, and that there is no causal connection between any adverse employment action and her protected activity. Finally, CBT moves for summary judgment on Harcourt and White's intentional or reckless infliction of emotional distress claims on the grounds that there is no evidence that it engaged in any extraordinary or outrageous conduct.

Plaintiffs move for summary judgment on their claims that CBT's policies interfered with their FMLA rights. Plaintiffs argue that CBT's leave policies are more restrictive than the FMLA allows and thus constitute per se violations of the Act.

The motions have been briefed and are ready for disposition.

II. Summary Judgment Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be

11

drawn therefrom.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654 (1962).  "The mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)(emphasis in original).  The Court will not grant summary judgment unless it is clear that a trial is unnecessary.  The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  <u>Anderson</u>, 477 U.S. at 250.  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  <u>Id.</u>

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment.  <u>Poller v. Columbia Broadcasting System, Inc.</u>, 368 U.S. 464, 472 (1962).  "[T]he issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties'

12

differing versions of the truth at trial." First National Bank
v. Cities Service Co., 391 U.S. 253, 288-89 (1968).

Moreover, although summary judgment must be used with
extreme caution since it operates to deny a litigant his day in
court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir.), cert.
dismissed, 444 U.S. 986 (1979), the United States Supreme Court
has stated that the "[s]ummary judgment procedure is properly
regarded not as a disfavored procedural shortcut, but rather as
an integral part of the Federal Rules as a whole, which are
designed to 'secure the just, speedy and inexpensive
determination of every action.'" Celotex Corp. v. Catrett, 477
U.S. 317, 327 (1986). According to the Supreme Court, the
standard for granting summary judgment mirrors the standard for a
directed verdict, and thus summary judgment is appropriate if the
moving party establishes that there is insufficient evidence
favoring the non-moving party for a jury to return a verdict for
that party. Id. at 323; Anderson, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper
"against a party who fails to make a showing sufficient to
establish the existence of an element essential to the party's
case and on which that party will bear the burden of proof at
trial." Celotex Corp., 477 U.S. at 322. Significantly, the
Supreme Court also instructs that the "the plain language of Rule
56(c) mandates the entry of summary judgment, after adequate time

13

for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence.  <u>Id.</u>; <u>Anderson</u>, 477 U.S. at 250.  Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."  <u>Id.</u>

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim.  <u>Id.</u>  Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits."  Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

### III. <u>Analysis</u>

#### A. <u>FMLA Claims</u>

As indicated, Plaintiffs argue that CBT's recertification, 15 day, and authenticity policies restrict their FMLA rights in violation of 29 U.S.C. § 2615(a)(1).  To prevail on an interference claim, a plaintiff must establish that 1) he or she is an "eligible employee;" 2) the defendant is an "employer;" 3) the employee was entitled to leave under the Act; 4) the employee gave the employer notice of his or intention to take leave; and 5) the employer denied the employee benefits to

14

which he or she was entitled.  See Hoge v. Honda of Am. Mfg.,
Inc., 384 F.3d 238, 244 (6th Cir. 2004).  The facts surrounding
Plaintiffs' FMLA claims are largely undisputed.  There does not
seem to be any dispute regarding the first four elements of the
claims.  The dispositive question is whether CBT denied or
restricted the FMLA rights to which Plaintiffs were entitled.  In
turn, resolution of the instant motions depends upon the proper
interpretation of the FMLA.  In this case, the Court agrees with
Plaintiffs that the policies at issue improperly interfere with
their FMLA rights.

        Under accepted canons of statutory interpretation, the
Court must interpret statutes as a whole, giving effect to each
word and making every effort not to interpret a provision in a
manner that renders other provisions of the same statute
inconsistent, meaningless or superfluous.  See Lake Cumberland
Trust, Inc. v. United States Environmental Protection Agency, 954
F.2d 1218, 1222 (6th Cir. 1992) (citation omitted).  The plain
meaning of the statute controls, except in rare cases in which
the literal application of the statutory language would compel an
odd result or produce a result demonstrably at odds with
legislative intent. See Public Citizen v. United States Dep't of
Justice, 491 U.S. 440, 454 (1989).  The Court must begin with the
statute's plain language, and may resort to a review of
congressional intent or legislative history only when the

language of the statute is not clear.  See In re Comshare, Inc.,
183 F.3d 542, 549 (6th Cir. 1999) (citing Consumer Prod. Safety
Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)).
Finally, the Court notes that "i[n] the absence of specific
statutory language governing a topic, agency regulations are
given controlling weight unless they are arbitrary, capricious,
or manifestly contrary to the statute."  Plant v. Morton Int'l,
Inc., 212 F.3d 929, 936 (6th Cir. 2000)(quoting Chevron U.S.A.
Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837
(1984)).  Finally, the Court notes that while an employer remains
free to develop and implement medical leave policies, any company
policy which is more restrictive than the requirements of the
FMLA is not enforceable against the employee.  Cavin v. Honda of
Am. Mfg., Inc., 346 F.3d 713, 722-23 (6th Cir. 2003).

### 1. The authenticity policy

The authenticity policy violates the FMLA.  Section
2613(b) clearly states that a certification is sufficient if it
is issued by the employee's health care provider and provides the
date of onset of the condition, the expected duration of the
condition, and the medical facts regarding the condition.[8]  If an

---

[8]   Section 2613 of Title 29 of the United States Code sets
forth the FMLA's certification requirements:

a) In general

An employer may require that a request for leave under
subparagraph (C) or (D) of section 2612(a)(1) of this

title be supported by a certification issued by the
health care provider of the eligible employee or of the
son, daughter, spouse, or parent of the employee, as
appropriate. The employee shall provide, in a timely
manner, a copy of such certification to the employer.

(b) Sufficient certification

Certification provided under subsection (a) of this
section shall be sufficient if it states--

(1) the date on which the serious health condition
commenced;

(2) the probable duration of the condition;

(3) the appropriate medical facts within the knowledge
of the health care provider regarding the condition;

(4)(A) for purposes of leave under section
2612(a)(1)(C) of this title, a statement that the
eligible employee is needed to care for the son,
daughter, spouse, or parent and an estimate of the
amount of time that such employee is needed to care for
the son, daughter, spouse, or parent; and

(B) for purposes of leave under section 2612(a)(1)(D)
of this title, a statement that the employee is unable
to perform the functions of the position of the
employee;

(5) in the case of certification for intermittent
leave, or leave on a reduced leave schedule, for
planned medical treatment, the dates on which such
treatment is expected to be given and the duration of
such treatment;

(6) in the case of certification for intermittent
leave, or leave on a reduced leave schedule, under
section 2612(a)(1)(D) of this title, a statement of the
medical necessity for the intermittent leave or leave
on a reduced leave schedule, and the expected duration
of the intermittent leave or reduced leave schedule;
and

(7) in the case of certification for intermittent

17

leave, or leave on a reduced leave schedule, under
section 2612(a)(1)(C) of this title, a statement that
the employee's intermittent leave or leave on a reduced
leave schedule is necessary for the care of the son,
daughter, parent, or spouse who has a serious health
condition, or will assist in their recovery, and the
expected duration and schedule of the intermittent
leave or reduced leave schedule.

(c) Second opinion

(1) In general

In any case in which the employer has reason to doubt
the validity of the certification provided under
subsection (a) of this section for leave under
subparagraph (C) or (D) of section 2612(a)(1) of this
title, the employer may require, at the expense of the
employer, that the eligible employee obtain the opinion
of a second health care provider designated or approved
by the employer concerning any information certified
under subsection (b) of this section for such leave.

(2) Limitation

A health care provider designated or approved under
paragraph (1) shall not be employed on a regular basis
by the employer.

(d) Resolution of conflicting opinions

(1) In general

In any case in which the second opinion described in
subsection (c) of this section differs from the opinion
in the original certification provided under subsection
(a) of this section, the employer may require, at the
expense of the employer, that the employee obtain the
opinion of a third health care provider designated or
approved jointly by the employer and the employee
concerning the information certified under subsection
(b) of this section.

(2) Finality

The opinion of the third health care provider

18

employee needs to care for a family member, the certification
must include a statement that the employee is needed to care for
the family member.  Finally, regarding intermittent leave, §
2613(b) includes certification requirements regarding the
expected date of treatment and the duration of the need for
intermittent leave, as well as a certification that intermittent
leave is needed to care for a family member if that happens to be
the case.  See 29 U.S.C. §§ 2613(a) & (b).  Nothing in § 2613(b)
makes a certification insufficient if the employee happens to
complete some or all of the information on the certification
form.  The critical point is that the certification be "issued"
by the health care provider and contain the information required
in § 2613(b), and in the Court's opinion, a certification is
"issued" by a health care provider when he or she endorses the
certification form, thus indicating agreement or adopting a
belief that information contained in the form is accurate.

Section 2613 also includes a procedure to follow if the
employer has reason to doubt the validity of the certification.

---

concerning the information certified under subsection
(b) of this section shall be considered to be final and
shall be binding on the employer and the employee.

(e) Subsequent recertification

The employer may require that the eligible employee
obtain subsequent recertifications on a reasonable
basis.

19

<u>See</u> 29 U.S.C. § 2613(c).  Given, however, that this section
describes a process for obtaining a second medical opinion, it is
clear that when it uses the word "validity," § 2613(c) means that
there is some reason for the employer to believe that health care
provider's opinion is wrong.  For instance, perhaps the
certification indicates that the employee needs six months of
continuous leave to recuperate from a tonsillectomy when one
would reasonably expect recovery to take two weeks at the most.
<u>See</u>, <u>e.g.</u>, http://www.nlm.nih.gov/medlineplus/ency/article/
003013.htm  (visited August 9, 2005).  In such a case, the
employer would have reason to doubt the validity of the
certification and be justified in seeking a second medical
opinion.  Section 2613(c), however, is silent regarding the
employer's rights and remedies where it has reason to believe
that the certification form has been forged or is inauthentic in
some way.

        If, however, the statute is silent on this point, the
regulations promulgated by the Department of Labor are not.  The
regulations make clear that a certification is sufficient if it
is complete and signed by the health care provider.  <u>See</u> 29
C.F.R. § 825.307(a).[9]  Section 825.307(a) also provides that the

_____

[9]     This regulation states:

        What may an employer do if it questions the adequacy of
        a medical certification?

employer's health care provider "may contact the employee's health care provider, with the employee's permission, for purposes of clarification and <u>authenticity</u> of the medical certification." <u>Id.</u> (emphasis added).  Thus, the employer's remedy where it believes that the certification is not authentic is to request permission to verify the authenticity of the certification with the employee's physician.

Read together, 29 U.S.C. § 2613 and 29 C.F.R. § 825.307(a) establish that a medical certification is sufficient

---

(a) If an employee submits a complete certification signed by the health care provider, the employer may not request additional information from the employee's health care provider. However, a health care provider representing the employer may contact the employee's health care provider, with the employee's permission, for purposes of clarification and authenticity of the medical certification.

. . .

(2) An employer who has reason to doubt the validity of a medical certification may require the employee to obtain a second opinion at the employer's expense. Pending receipt of the second (or third) medical opinion, the employee is provisionally entitled to the benefits of the Act, including maintenance of group health benefits. If the certifications do not ultimately establish the employee's entitlement to FMLA leave, the leave shall not be designated as FMLA leave and may be treated as paid or unpaid leave under the employer's established leave policies. The employer is permitted to designate the health care provider to furnish the second opinion, but the selected health care provider may not be employed on a regular basis by the employer. See also paragraphs (e) and (f) of this section.

29 C.F.R. § 825.307(a) (2005).

21

and must be accepted by the employer if it contains the
information required by the statute and is signed by the
employee's health care provider.  If the employer has reason to
believe that the certification is wrong, it can obtain a second
medical opinion.  If the employer doubts the authenticity of the
certification it can ask the employee for permission to verify
its authenticity with his or her health care provider.

In other words, the statute and the regulation
establish that the medical certification provided by the employee
is presumptively valid if it contains the required information
and is signed by the health care provider.  The burden is on the
employer to establish that the certification is invalid or
inauthentic.  One of the goals of the FMLA is to allow an
employee to obtain needed medical leave in a swift and
expeditious manner upon presentation of an adequate
certification.  Sims v. Alameda-Contra Costa Trans. Dist., 2 F.
Supp.2d 1253, 1261 (N.D.Cal. 1998).  In this case, CBT does not
claim that the certification form which Harcourt completed was
inadequate, i.e., did not include the information required by
statute.  CBT's only problem with Harcourt's certification form
is that she filled in the blanks instead of her health care
provider.  Nevertheless, CBT's policy of disciplining employees
who complete some or all of the certification form without
utilizing any of the procedures provided by the statute and the

22

regulations results in restricting the employees' FMLA rights because they should not be disciplined for submitting adequate medical certifications.  Although CBT's policy has the virtue of eliminating authenticity questions up front, it comes at the cost of shifting administrative burdens the statute puts on the employer to the employee.  Therefore, CBT's authenticity policy violates the FMLA.

Accordingly, CBT's motion for summary judgment on this issue is not well-taken and is **DENIED**; Plaintiffs' motion for summary judgment on this issue is well-taken and is **GRANTED**.

### 2.  The recertification policy

The recertification policy violates the FMLA.  As indicated, CBT requires employees to recertify their need for FMLA leave every ninety days regardless of whether the healthcare providers's certification indicates that the need for leave will be longer.

Section 2613(e) states only that an employer may require the employee to submit subsequent certifications "on a reasonable basis."  29 U.S.C. § 2613(e).  Were this the only guidance available, CBT's recertification policy would likely be reasonable and in compliance with the FMLA.  The regulations issued by the Department of Labor, however, provide additional

23

content regarding the meaning of "reasonable basis."[10]

_____

[10]     The regulation states:

Under what circumstances may an employer request
subsequent recertifications of medical conditions?

(a) For pregnancy, chronic, or permanent/long-term
conditions under continuing supervision of a health
care provider (as defined in § 825.114(a)(2)(ii), (iii)
or (iv)), an employer may request recertification no
more often than every 30 days and only in connection
with an absence by the employee, unless:

(1) Circumstances described by the previous
certification have changed significantly (e.g., the
duration or frequency of absences, the severity of the
condition, complications); or

(2) The employer receives information that casts doubt
upon the employee's stated reason for the absence.

(b)(1) If the minimum duration of the period of
incapacity specified on a certification furnished by
the health care provider is more than 30 days, the
employer may not request recertification until that
minimum duration has passed unless one of the
conditions set forth in paragraph (c)(1), (2) or (3) of
this section is met.

(2) For FMLA leave taken intermittently or on a reduced
leave schedule basis, the employer may not request
recertification in less than the minimum period
specified on the certification as necessary for such
leave (including treatment) unless one of the
conditions set forth in paragraph (c)(1), (2) or (3) of
this section is met.

(c) For circumstances not covered by paragraphs (a) or
(b) of this section, an employer may request
recertification at any reasonable interval, but not
more often than every 30 days, unless:

(1) The employee requests an extension of leave;

(2) Circumstances described by the previous
certification have changed significantly (e.g., the

24

Subsection (a) of 29 C.F.R. § 825.308 indicates that an employer may request recertification every thirty days for absences due to pregnancy or chronic and/or long-term conditions and may request recertification more often if circumstances have changed or the employer receives information that casts doubt upon the employee's stated reason for the absence. The employer's authority to obtain a recertification every thirty days is limited, however, by subsection (b) of § 825.308. Subsection (b) states that if the employee's health care provider has specified a minimum duration the employee needs FMLA leave, the employer may not request recertification in less than the minimum period specified on the certification unless the employee requests an extension of leave, circumstances have changed, or the employer

---

           duration of the illness, the nature of the illness, complications); or

           (3) The employer receives information that casts doubt upon the continuing validity of the certification.

           (d) The employee must provide the requested recertification to the employer within the time frame requested by the employer (which must allow at least 15 calendar days after the employer's request), unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts.

           (e) Any recertification requested by the employer shall be at the employee's expense unless the employer provides otherwise. No second or third opinion on recertification may be required.

29 C.F.R. § 825.308 (2005).

receives information that casts doubt on the validity of the
certification.  Finally, subsection (c) of § 825.308 is a catch-
all provision which applies if subsections (a) and (b) are
inapplicable.  Subsection (c) allows the employer to obtain a
recertification at any reasonable interval, but not more
frequently than every thirty days, unless one of the above three
exceptions applies.

        Each of these subsections apply to three very different
circumstances.  Subsection (a) applies when the employee is
pregnant or has a long-term or chronic condition and the
employee's healthcare provider has not otherwise specified a
minimum duration the employee needs leave, and then only in
connection with an absence of an employee.  Under that
circumstance, the employer can request recertification every
thirty days.  Application of subsection (a) is apparently,
however, limited to situations where the employee requests that
the employer designate an absence which has already occurred as
FMLA leave.  See 60 Fed. Reg. 2180-01, 2225 (Jan. 6, 1995) ("For
chronic conditions, recertification is ordinarily permitted every
30 days, but only in connection with an absence.  Exceptions are
provided only if circumstances have changed significantly or the
employer has reason to believe the employee was not absent for
the reason indicated.")(emphasis added).  Use of the past tense
indicates that the Department of Labor was referring to

26

situations where the employee is seeking to designate retroactively an absence as an FMLA leave.

Subsection (b) makes clear, however, that if the employee's healthcare provider has specified a minimum period the employee needs FMLA leave, the employer may not request recertification of the condition until the term specified by the healthcare provider has expired, unless an exception applies.  In order to give effect to subsection (b), it must be interpreted to trump subsections (a) and (c) where it applies.  For example, if a pregnant employee's healthcare provider certifies that she needs intermittent leave over a six month period, then the employer may not obtain a certification before the end of that period, unless an exception applies.  See id. ("Section 825.308 has been changed to provide that where a certification provides a minimum duration of more than 30 days, the employer may not obtain recertification until that minimum period has passed unless the circumstances specified in the regulations are present.").  If subsection (b) were interpreted so as not to supercede subsection (a), then the employer would be empowered to simply nullify the healthcare provider's opinion that a longer period of leave was needed without having to resort to any of the exceptions in the regulation.  Moreover, it is plainly not reasonable to require an employee to recertify a condition more often than the period specified by the employee's healthcare

27

provider if the employer is not challenging either the reasons for the employee's absence or the validity of the employee's certification. <u>See</u> <u>id.</u> ("[T]he Department agrees that permitting the employer to routinely request recertification every 30 days is not reasonable in some circumstances.").

Finally, subsection (c) is obviously a catch-all because it says it is. <u>See</u> 29 C.F.R. § 825.308(c) ("For circumstances not covered by paragraphs (a) or (b) of this section . . . ."). Thus, subsection (c) applies where the employee's condition is not chronic and the employee's healthcare provider has not specified a duration that leave is required. An example that comes to mind when subsection (c) might apply is where the employee needs time to recover from an accident that does not cause any permanent injuries. For instance, the employee may be rendered immobile for a indeterminate period of time because of a broken leg. In that case, the employer can require the employee to recertify his need for FMLA leave every thirty days.

CBT argues that its policy is more generous than the regulations allow because Plaintiffs each indicated that the need for leave was due to a chronic condition and in such a case the regulations permit the employer to obtain recertification every thirty days for a chronic condition. In essence, CBT's position is that subsection (a) trumps subsection (b) where the employee's

28

need for leave is due to a chronic condition.  This reading of
the regulation, however, makes little sense.  If the healthcare
provider has already certified that the employee's condition will
last a certain minimum period, there is little reason to suppose
that the healthcare provider is likely to alter that opinion
prior to the expiration of that period.  But even if it that
assumption is wrong, if the circumstances surrounding the
employee's need for intermittent leave appear to have changed,
the employer still maintains the option of requiring
recertification.

        Stated another way, the only reason to require an
employee to recertify his or her medical condition at specified
minimum intervals, despite a healthcare provider's certification
that the need for leave will exceed the minimum interval, is the
off chance that the employee's condition will have improved such
that leave is no longer necessary.  This kind of procedure is
unnecessary because under the regulations, in order to qualify as
a chronic condition, it must require periodic treatment by a
healthcare provider.  29 C.F.R. § 825.800(3)(i).  It is not
unreasonable to assume that in the course of these periodic
treatments a healthcare provider will advise the employee that
leave is no longer needed because his or her condition has
improved.  And, to reiterate, the employer still has the changed
circumstances exception available to obtain a recertification.

CBT's interpretation of the regulation only results in employees going through the motions of providing superfluous certifications.  Finally, the Court's interpretation of § 825.308 does not read out subsection (a) because that subsection still applies where the healthcare provider does not specify a minimum duration that leave is required.

In this case, CBT's policy of restricting intermittent leave to ninety days as a matter of course regardless of the health provider's certification that the employee needs more than ninety days of intermittent leave is a plain violation of § 825.308(b) where no other exception applies.  The Court notes that CBT never challenged the validity of any certification tendered by Plaintiffs in this case, nor does it contend that any other exception applies.  It follows then that CBT violated Plaintiffs' FMLA rights by arbitrarily requiring them to recertify their FMLA-qualifying conditions every ninety days when their healthcare providers certified that a longer period of leave was required.

Thus, on the undisputed facts of the case, in its enforcement of the recertification policy, CBT interfered with or restrained Plaintiffs' FMLA rights in violation of 29 U.S.C. § 2615(a)(1).  Accordingly, Plaintiffs' motion for summary judgment on this issue is well-taken and is **GRANTED**; CBT's motion for summary judgment on this issue is not well-taken and is **DENIED.**

30

c. The 15 day policy

Finally, the Court concludes that CBT's 15 day policy violates the FMLA.  The FMLA does not mandate that the employee provide a medical certification when the need for FMLA leave arises.  The FMLA does, however, authorize the employer to require its employees to provide medical certifications to substantiate the need for FMLA leave.  29 U.S.C. § 2613(a). Section 2613 does not specify the time frame in which employees must provide a medical certification to the employer.  Rather, § 2613(a) states only that "[t]he employee shall provide, in a timely manner, a copy of such certification to the employer." Id.

The applicable regulations again fill in the gaps of the statutory language.  Section 825.305 of Title 29 of the Code of Federal Regulations states:

> When must an employee provide medical certification to support FMLA leave?
>
> (a) An employer may require that an employee's leave to care for the employee's seriously-ill spouse, son, daughter, or parent, or due to the employee's own serious health condition that makes the employee unable to perform one or more of the essential functions of the employee's position, be supported by a certification issued by the health care provider of the employee or the employee's ill family member.  An employer must give notice of a requirement for medical certification each time a certification is required; such notice must be written notice whenever required by § 825.301. An employer's oral request to an employee to furnish any subsequent medical certification is sufficient.

31

> (b) When the leave is foreseeable and at least 30 days notice has been provided, the employee should provide the medical certification before the leave begins. When this is not possible, the employee must provide the requested certification to the employer within the time frame requested by the employer (which must allow at least 15 calendar days after the employer's request), unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts.

29 C.F.R. § 825.305(a) & (b).

As indicated, where the need for leave is unforeseen, CBT's policy requires employees to provide a medical certification within fifteen days of the employee's first day of absence in order to qualify as an FMLA absence. CBT relies on the employee handbook as a blanket notice to employees that it wants a medical certification each time an employee wishes to take FMLA leave for unforeseen absences. It is apparent that CBT drafted the policy in this manner so that it does not have to make an individual request for a medical certification each time an employee has a potentially FMLA-qualifying medical condition. CBT contends that this policy comports with the FMLA because although the regulations state that the employer must request certification, they do not specify how that request should be made. The Court agrees with Plaintiffs, however, that the 15 day policy violates the FMLA.

The Court notes that the 15 day policy would violate the FMLA even if the blanket notice in the employee handbook were a sufficient request for medical certification because it does

32

not grant employees any leeway to provide it later if circumstances so warrant.  The regulation specifically states that the employee has fifteen days after the request to provide medical certification unless "it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts."  29 C.F.R. § 825.305(b).  Despite the regulation's clear instruction that the employer must allow the employee more time to provide medical certification if circumstances so dictate, the record demonstrates that CBT rigidly and unyieldingly enforces fifteen days as the maximum time it allows employees to provide medical certifications for unforeseen absences.

Plaintiff White, for instance, was a victim of the 15 day rule in July 2002.  White started an absence from work on June 26, 2002 for what she thought was a kidney infection that would only cause her to miss a few days work.  White Dep. at 44. White did not learn from her physician until July 3, however, that she actually had a urinary tract infection and would require a more extended leave.  Id.  She requested FMLA leave papers from CBT the same day, but she did not receive them until July 8. White delivered the certification form to her doctor's office the same day, but her doctor did not return the certification form until after July 10.  CBT counted June 26 as White's first day of absence, and under the 15 day rule, the certification form was

33

due July 10.  White, therefore, was assessed an attendance
occurrence for this absence.  After White tried in several emails
to explain the reason she could not comply with the rule, Nuss
informed her that "I cannot change the decision regarding the
chargeable occurrence because we have a company policy that goes
out to all employees two times a year to address these issues."
Doc. No. 69, Ex. C.  In other words, on this occasion Nuss failed
to consider whether White made a good faith effort to provide the
medical certification form under the circumstances - she just
blindly enforced the rule.  Although Nuss states in her emails
that White could have been granted an extension to provide the
certification had her physician contacted CBT prior to July 10,
the Court notes that the employee manual in this record, and upon
which CBT relies, does not inform employees that extensions of
the fifteen day rule can be obtained.  Harcourt Dep. Ex. 1.

This rigid application of the 15 day rule was a
violation because: 1) the regulations state that an employee
should give notice within one or two days of learning of the need
for leave and White gave notice that she needed FMLA leave as
soon as she realized she had an FMLA condition;[11] 2) the

_____

[11]  See 29 C.F.R. § 825.303(a) ("When the approximate
timing of the need for leave is not foreseeable, an employee
should give notice to the employer of the need for FMLA leave as
soon as practicable under the facts and circumstances of the
particular case. It is expected that an employee will give notice
to the employer within no more than one or two working days of
learning of the need for leave, except in extraordinary
circumstances where such notice is not feasible.").

regulations recognize that sometimes an employee will take sick leave for a condition that worsens into a serious health condition and the entire absence can then be designated as FMLA leave -- essentially the scenario that occurred to White on this occasion;[12] 3) it was unreasonable for CBT, having backdated the start of the 15 day clock prior to the time that White realized that she had an FMLA condition, and where apparently there was no notice that an extension could be obtained, to penalize her because it took five days for the forms to reach her in the mail; in actuality CBT only afforded White two days to provide a medical certification for an FMLA health condition. Stated another way, as a whole, the regulations indicate that an employee should have at least fifteen days to provide a medical certification to the employer from the date she learns she has a serious health condition under the FMLA. The 15 day policy does not allow this and therefore results in a restraint in eligible employees' FMLA rights.

More fundamentally, however, the blanket notice upon which CBT relies does not comply with the FMLA because the regulations state that the employer shall notify the employee

---

[12]    See 29 C.F.R. § 825.208(d) ("[W]hen the employee takes sick leave that turns into a serious health condition (e.g., bronchitis that turns into bronchial pneumonia) and the employee gives notice of the need for an extension of leave, the entire period of the serious health condition may be counted as FMLA leave.").

"each time a certification is required."  29 C.F.R. § 825.305(a).
Use of the term "each time" indicates that the employer is
required to notify the employee on a per occasion basis that it
wants medical certification to substantiate the need for FMLA
leave.  This conclusion is further buttressed by the language of
subsection (c), which discusses the timing of the employer's
request for medical certification.  Subsection (c) indicates that
in most cases an employer's request for medical certification
should be fairly contemporaneous with the employee's request for
FMLA leave.  See 29 C.F.R. 825.305(c).[13]  In other words, the
regulation indicates that a general notice that the employer
wants medical certification for an absence is insufficient.
Under similar circumstances, a court found that a blanket notice
in the employee manual was insufficient for the employer to
comply with its obligation to give an employee notice when it
requires a medical certification.  Henderson v. Whirlpool Corp.,
17 F. Supp.2d 1238, 1248 (N.D.Okla. 1998).

---

[13]   Subsection (c) states:

> In most cases, the employer should request that an
> employee furnish certification from a health care
> provider at the time the employee gives notice of the
> need for leave or within two business days thereafter,
> or, in the case of unforeseen leave, within two
> business days after the leave commences.  The employer
> may request certification at some later date if the
> employer later has reason to question the
> appropriateness of the leave or its duration.

Id. (emphasis added).

Therefore, for the reasons stated, the Court concludes that the 15 day policy does not comply with the FMLA and results on a restraint on employees' FMLA rights.  Accordingly, CBT's motion for summary judgment on this issue is not well-taken and is **DENIED**; Plaintiffs' motion for summary judgment on this issue is well-taken and is **GRANTED.**

### d. damages

CBT further contends that it is entitled to summary judgment because Plaintiffs did not suffer any actual injury from its violations of the FMLA.  At the most, CBT argues, its violations of the FMLA were only technical, and for which there is no recovery.  Plaintiffs respond that they have suffered economic injuries but in any event they are entitled to injunctive relief to enjoin CBT's unlawful practices.  In reply, CBT argues that Plaintiffs are not even entitled to injunctive relief because they receive all of the FMLA benefits to which they were entitled.

The FMLA authorizes district courts to grant an aggrieved employee "such equitable relief as may be appropriate, including employment, reinstatement, and promotion."  29 U.S.C. 2617(a)(1)(B).  "Equitable relief" includes injunctive relief. Frizzell v. Southwest Motor Freight, 154 F.3d 641, 644 (6th Cir. 1998).  This Court recognizes that under the FMLA, plaintiffs are not entitled to symbolic victories for technical violations of

37

the Act.  See, e.g., Dawson v. Leewood Nursing Home, Inc., 14 F. Supp.2d 828, 823 (E.D.Va. 1998).  To the extent, however, that CBT argues that Plaintiffs need to show economic loss in order to maintain an FMLA action, even Dawson, upon which CBT relies, recognizes that summary judgment is inappropriate if the plaintiff can demonstrate damages or the right to injunctive relief.  See id. ("[W]e find that a plaintiff must be able to show a reasonable likelihood that a rational trier of fact would award her damages or find that she is entitled to injunctive relief to avoid the entry of summary judgment in defendants' favor.").  Assuming, without deciding, that Plaintiffs in this case have not suffered any economic damages, the record still demonstrates that Plaintiffs could obtain injunctive relief.

There is a substantial difference between an employer committing a technical violation of the FMLA and the employer's wholesale enforcement of policies which violate the FMLA.  In the Court's opinion, a technical violation occurs when an employer makes a mistake in applying the FMLA in a particular circumstance.  In this case, however, the evidence demonstrates that CBT rigidly and uniformly enforced unlawful leave policies.  These policies transcend mere technical violations of the FMLA.

More importantly, an employer violates the FMLA by discouraging or chilling employees from exercising their FMLA rights.  See Saroli v. Automation & Modular Comp., Inc., 405 F.3d

38

446, 454 (6th Cir. 2005); <u>Batchelder v. America West Airlines,</u>
<u>Inc.</u>, 259 F.3d 1112, 1113 (9th Cir. 2001) ("[T]he established
understanding at the time the FMLA was enacted was that employer
actions that deter employees' participation in protected
activities constitute 'interference' or 'restraint' with the
employees' exercise of their rights."); 29 C.F.R. §
825.220(b)("'Interfering with' the exercise of an employee's
rights would include, for example, not only refusing to authorize
FMLA leave, but discouraging an employee from using such
leave."). There was substantial evidence that CBT's policies
actually discouraged Plaintiffs from utilizing their FMLA
entitlements. White testified that on two occasions she used
vacation leave instead of applying for FMLA leave because of
CBT's policies. Harcourt quit her job because of the
frustrations she encountered trying to use her FMLA benefits.

Finally, employers should not be able to maintain
unlawful policies just because their employees eventually receive
the leave and benefits to which they are entitled. The FMLA was
not intended to impose onerous procedural burdens on employees
who need medical leaves of absence. <u>Manuel v. Westlake Polymers</u>
<u>Corp.</u>, 66 F.3d 758, 763 (5th Cir. 1995). In this case, the
evidence demonstrates that the policies at issue are onerous to
employees. The recertification policy in particular is
needlessly onerous for employees like Plaintiffs whose healthcare

39

providers have specified a minimum term that leave is needed and represents nothing more than an exercise in jumping through hoops at CBT's behest.

In short, even assuming Plaintiffs have no economic damages, there is sufficient evidence to show that Plaintiffs have incurred injuries which would entitle them to injunctive relief.  Plaintiffs do not complain about mere technical violations of the FMLA.  Accordingly, CBT's motion for summary judgment on the grounds that Plaintiffs have not suffered any actual injury is not well-taken and is **DENIED.**

e. constructive discharge

Plaintiff Harcourt contends that CBT constructively discharged her from her position in violation of the FMLA as a result of its medical leave policies and FMLA violations.  The Sixth Circuit has recognized that an employee can be constructively discharged because of her employer's FMLA violations.  Saroli, 405 F.3d at 451.  A constructive discharge occurs when the employer deliberately creates intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit.  Id.  The trial court must examine both the employer's intent and the employee's objective feelings.  Id.  The stringent intent requirement can, however, be met by demonstrating that quitting was a foreseeable

40

consequence of the employer's actions.  <u>Goldmeier v. Allstate Ins. Co.</u>, 337 F.3d 629, 636 (6th Cir. 2003).

In assessing whether working conditions were intolerable, the court can consider the following non-exhaustive list of factors: 1) demotion; 2) reduction in salary; 3) reduction in job responsibilities; 4) reassignment to menial or degrading work; 5) reassignment to work under a [male] supervisor; 6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or 7) offers of early retirement or continued employment on terms less favorable than the employee's former status.  <u>Id.</u>  In addition to these factors, in <u>Saroli</u>, the Court found that the fact that the employer made the process of obtaining maternity leave "exceedingly difficult" was evidence that supported a constructive discharge claim.  <u>Saroli</u>, 405 F.3d at 452.

In this case, viewing the evidence in the light most favorable to Harcourt, a juror could find that she was constructively discharged.  First, similar to the case in <u>Saroli</u>, the record demonstrates that CBT made it exceedingly difficult for Harcourt to utilize her FMLA benefits.  In addition, CBT unjustifiably suspended Harcourt without pay under the unlawful authenticity policies, which in turn disqualified her from a transfer to at least one position that was more favorable. <u>FiveCAP, Inc. v. N.L.R.B.</u>, 294 F.3d 768, 788 (6th Cir.

41

2002)(reprimands for failure to comply with contrived policies supported constructive discharge claim).  Moreover, Harcourt's constructive discharge claim should be examined against the purpose of the FMLA.  The FMLA was enacted, in part, "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity."  29 U.S.C. § 2601(b)(1).  In other words, Congress enacted the FMLA to relieve employees from having to choose between keeping their jobs and taking care of their families.  In this case, according to Harcourt, CBT's unlawful medical leave policies forced her to make a choice which Congress has said she should not have to make.  Whether that choice was reasonable under the circumstances should be resolved by a jury.  Finally, with regard to CBT's intent, if an employer enacts policies which discourage employees from exercising their FMLA rights, then a reasonably foreseeable consequence of that action is that employees will resign their jobs so that they can better manager their own or their families' health needs.  Thus, a reasonable juror could find that Harcourt's resignation was a foreseeable consequence of CBT's policies.  Finally, a juror could find that Harcourt's constructive discharge was related to her exercise of FMLA rights since she specifically stated that she resigned because of CBT's medical leave policies.

In summary, a reasonable juror could find that CBT constructively discharged Harcourt because of her use or attempted use of FMLA leave.  Accordingly, CBT's motion for summary judgment on Plaintiff Harcourt's FMLA constructive discharge claim is not well-taken and is **DENIED.**

    B. Intentional Infliction of Emotional Distress

Plaintiffs White and Harcourt assert state law claims against CBT for intentional infliction of emotional distress.  To recover for intentional infliction of emotional distress the plaintiff must prove: 1) That the defendant either intended to cause the plaintiff emotional distress or that he knew or should have known that his actions would cause the plaintiff emotional distress; 2) That the defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community; 3) That the defendant's conduct was the proximate cause of plaintiff's psychic injury; and 4) That the resultant emotional distress was serious, such that a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstance.  Uebelacker v. Cincom Sys., Inc., 549 N.E.2d 1210, 1219 (Ohio Ct. App. 1988).  CBT argues that summary judgment on Plaintiffs' intentional infliction of emotional distress claims

43

is warranted because it did not engage in any extreme or outrageous conduct.  The Court agrees.

Only rarely will offensive conduct reach the level necessary to support a claim for intentional infliction of emotional distress.  Scarabino v. E. Liverpool City Hosp., 802 N.E.2d 188, 190 (Ohio Ct. App. 2003).  "Only the most extreme wrongs, which do gross violence to the norms of a civilized society, will rise to the level of outrageous conduct."  Brown v. Denny 594 N.E.2d 1008, 1012 (Ohio Ct. App. 1991).  In fact, even conduct which can be characterized as malicious or criminal is not considered outrageous.  Id.  In this case, although CBT implemented policies which violated the FMLA, and then unyieldingly enforced them, the Court finds that this does not rise to the level of outrageous conduct as a matter of law. These polices, however wrongful they are, simply do not "do gross violence to the norms of a civilized society."  Compare with McNeil v. Case Western Res. Univ., 664 N.E.2d 973, 977 (Ohio Ct. App. 1995) (finding insufficiently outrageous as a matter of law defendant's alleged conduct of harassing plaintiff to retire, urging plaintiff's daughter to persuade plaintiff to retire, leading co-workers to believe that plaintiff had retired when she simply had taken a few days off, and intentionally locking her "out of the room in which she kept her personal belongings"); Ford v. General Motors Corp., 305 F.3d 545, 555 (6th Cir.

44

2002)("Ford may be able to establish that GM's conduct was intentional or reckless, but cannot claim credibly that an increased workload, heightened scrutiny, and constructive discharge was so outrageous and intolerable as to offend generally accepted standards of morality and decency.")(Kentucky law, but with same standards as Ohio law).

Accordingly, CBT's motion for summary judgment on Plaintiffs' claims for intentional infliction of emotional distress is well-taken and is **GRANTED**.  These claims are **DISMISSED WITH PREJUDICE.**

<u>Conclusion</u>

In conclusion, CBT's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.** CBT's motion is not well-taken and is **DENIED** with respect to Plaintiffs' FMLA claims. The motion is well-taken and is **GRANTED** with respect to Plaintiffs' state law claims for intentional infliction of emotional distress. Those claims are **DISMISSED WITH PREJUDICE.**

The record demonstrates that CBT's recertification, authenticity, and 15 day policies restricted Plaintiffs' FMLA rights in violation of 29 U.S.C. § 2615(a)(1). Accordingly, Plaintiffs' motion for partial summary on this aspect of their FMLA claims is well-taken and is **GRANTED.**

**IT IS SO ORDERED**

Date___August 18, 2005_____      _____s/Sandra S. Beckwith_____
                                 Sandra S. Beckwith, Chief Judge
                                   United States District Court

46